IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ROBERT W. MAUTHE, M.D., P.C., | : | |
| individually and on behalf of all others | : | |
| similarly situated, | : | |
| | : | |
| Plaintiff, | : | CIVIL ACTION NO. 18-1903 |
| | : | |
| v. | : | |
| | : | |
| MILLENNIUM HEALTH LLC, | : | |
| | : | |
| Defendant. | : | |

**MEMORANDUM OPINION**

Smith, J.                                                                                    May 29, 2020

The plaintiff brings a Telephone Consumer Protection Act ("TCPA") claim and state law conversion claim against the defendant, alleging a one-page fax promoting a free seminar about urine drug testing, which the plaintiff received from the defendant, constituted an unsolicited advertisement. The defendant moves for summary judgment.

After reviewing the parties' submissions and the operative complaint, the court grants the defendant's motion for summary judgment with respect to the plaintiff's claims brought under the TCPA because the fax does not constitute an unsolicited advertisement as defined outright in the TCPA. The court also dismisses without prejudice the remaining state law claim because the court declines to exercise jurisdiction over it. In rendering this decision, the court does not pull back the curtain and examine whether the fax for the free seminar was actually a pretext in that the defendant used the free seminar to promote its goods or services. The court concludes that it need not engage in a pretext analysis, and, instead, only examines the fax on its face.

# I.       PROCEDURAL HISTORY

The plaintiff, Robert W. Mauthe, M.D., P.C., filed the original complaint against the defendant, Millennium Health LLC, on May 7, 2018. Doc. No. 1. The following day, the plaintiff filed a motion for class certification. Doc. No. 2. On May 16, 2018, this court denied the motion for class certification without prejudice, given that the plaintiff had not yet engaged in any discovery or even served the defendant with the complaint. May 16, 2018 Order at 1, Doc. No. 4. The defendant filed a motion to dismiss, or, alternatively, motion to stay the plaintiff's original complaint due to separate, ongoing litigation. Millennium Health, LLC's Mot. to Dismiss or, Alternatively, Mot. to Stay at 1, Doc. No. 26.

The plaintiff filed the first amended class action complaint on August 23, 2018. Doc. No. 29. The amended complaint alleges that the defendant violated the TCPA by sending the plaintiff a fax on May 2, 2017, which discussed a free seminar hosted by the defendant. Am. Compl. at ¶¶ 14, 15, 45, and Ex. A. The plaintiff alleges that the defendant violated the TCPA by sending this fax because (1) the fax "advertises Defendant's 'free' webinars—which are merely 'free' seminars conducted through an internet website—to recipients (*i.e.*, medical providers such as Plaintiff)"; (2) "Defendant's webinars serve as a pretext for advertising and promoting the commercial availability and quality of Defendant's products and services, including its prescription drug monitoring products and related services"; and (3) the "Defendant's webinar, and the fax that the Defendant sent promoting it, is a pretext to advertise Defendant's drug-monitoring products and services, either during the webinar or thereafter using the contact information provided by fax recipients during the registration process." *Id.* at ¶¶ 45, 9, 19.

In response to the amended complaint, the defendant filed a motion to dismiss for failure to state a claim, or, alternatively, motion to stay the case in anticipation of separate, ongoing

litigation on September 6, 2018. Millennium Health, LLC's Mot. to Dismiss the First Am. Compl. or, Alternatively, Mot. to Stay, Doc. No. 30. Upon receiving notice of this motion, the court denied the first motion to dismiss, or, alternatively, stay as moot on September 10, 2018. Doc. No. 31. The plaintiff filed a response in opposition to the defendant's motion on October 4, 2018. Doc. No. 33. After receiving two extensions of time, the defendant filed a reply in support of its motion on December 6, 2018. Doc. Nos. 36, 38, 39. The court held an initial pretrial conference and oral argument on the motion on Tuesday, January 8, 2019. Doc. No. 44. On January 10, 2019, the court denied the defendant's motion without prejudice to the defendant raising its arguments in a motion for summary judgment. Jan. 10, 2019 Order at 1, Doc. No. 43. Additionally, the court ordered the parties to engage in limited discovery on the issue of whether the fax was an advertisement or "part of a larger advertising scheme." *Id.*

After engaging in limited discovery, on August 26, 2019, the defendant filed the instant motion for summary judgment, supporting brief, and statement of uncontested facts. Doc. No. 61. On October 7, 2019, the plaintiff filed a brief in opposition to the motion for summary judgment, response to the defendant's statement of facts, and statement of additional facts. Doc. No. 66. On November 4, 2019, the defendant filed a reply in support of its motion, which also included the defendant's responses to the plaintiff's statement of additional facts. Doc. No. 70.

## II.   FACTUAL BACKGROUND

The uncontested facts are as follows. The plaintiff is a private medical practice located in Center Valley, Pennsylvania. Def. Millennium Health, LLC's Separate Statement of Undisputed Facts ("Def.'s Facts") at ¶ 1, Doc. No. 61-4; Pl.'s Resp. to Def. Millennium Health, LLC's Statement of Undisputed Facts ("Pl.'s Resp.") at ¶ 1, Doc. No. 66-1. The plaintiff has been a named plaintiff in at least eleven other cases alleging TCPA violations. Def.'s Facts at ¶ 2; Pl.'s Resp. at

¶ 2.[1] The defendant is a laboratory that provides medication monitoring and drug-testing services, including urine drug testing, to clinicians and healthcare professionals who require information about patients' recent use of prescription medications and illicit drugs. Def.'s Facts at ¶¶ 8–9; Pl.'s Resp. at ¶¶ 8–9. Urine drug testing is a clinical tool that provides objective information about medications, recent medication use, or use of illicit substances. Def.'s Facts at ¶ 10; Pl.'s Resp. at ¶ 10. The plaintiff had previously submitted some of his patients' urine specimens to the defendant for drug testing. Def.'s Facts at ¶ 14; Pl.'s Resp. at ¶ 14. The plaintiff provided the defendant with his fax number in this context. Def.'s Facts at ¶ 14; Pl.'s Resp. at ¶ 14.

## A.    The Fax

On May 2, 2017, the defendant sent the plaintiff a one-page fax, which is the subject of this litigation. Def.'s Facts at ¶ 15; Pl.'s Resp. at ¶ 15. The defendant sent this one page fax to its entire customer base. Pl.'s Statement of Add'l Facts in Opp. to Def.'s Mot. for Summ. J. ("Pl.'s Add'l Facts") at ¶ 3; Millennium Health LLC's Resp. to Pl's Statement of Add'l Facts ("Def.'s Resp.") at ¶ 3. The top of the fax contains the defendant's corporate logo and a header that reads

---

[1] The Third Circuit is very familiar with "Dr. Mauthe [who] operates a medical practice in Pennsylvania. He is a frequent litigant. One might say he has a subspecialty in suing people under the TCPA." *Fischbein v. Olson Research Grp., Inc.*, Nos. CIV. A. 19-3018, 19-3222, 2020 WL 2505178, at *4 (3d Cir. May 15, 2020) (Jordan, J., dissenting) (collecting cases). As the parties recognize, Dr. Mauthe has been a named plaintiff in at least 11 other cases alleging violations of the TCPA. *See Robert W. Mauthe, M.D., P.C. v. ITG, Inc., et al.*, No. CIV. A. 5:18-1968-CFK (E.D. Pa.) (filed on May 10, 2018); *Robert W. Mauthe, M.D., P.C. v. Mehdi Med. LLC*, No. CIV. A. 5:18-1967-JLS (E.D. Pa.) (filed May 10, 2018); *Robert W. Mauthe, M.D., P.C. v. Spreemo, Inc., et al.*, No. CIV. A. 5:18-1902-CFK (E.D. Pa.) (filed May 7, 2018); *Robert W. Mauthe, M.D., P.C. v. MCMC LLC*, No. CIV. A. 5:18-1901-EGS (E.D. Pa.) (filed May 7, 2018); *Robert W. Mauthe, M.D., P.C. v. Gaither Techs. STC, LLC, et al.*, No. CIV. A. 5:17-2154-LS (E.D. Pa.) (filed May 10, 2017); *Robert W. Mauthe, M.D., P.C. v. Nat'l Imaging Assocs., Inc.*, No. CIV. A. 5:17-1916-LS (E.D. Pa.) (filed Apr. 26, 2017); *Robert W. Mauthe, M.D., P.C. v. Optum, Inc., et al.*, No. CIV. A. 5:17-1643-EGS (E.D. Pa.) (filed Apr. 11, 2017); *Robert W. Mauthe, M.D., P.C. v. OPTUM360, LLC*, No. CIV. A. 17-945 (E.D. Pa.) (filed Mar. 1, 2017); *Comprehensive Health Care Sys. of the Palm Beaches, Inc., et al. v. M3 USA Corp., et al.*, No. CIV. A.16-80967-AHS (S.D. Fla.) (filed June 10, 2016); *Robert W. Mauthe, M.D., P.C. v. Pharmakon Solutions, LLC, et al.*, No. CIV. A. 5:15-4275-LS (E.D. Pa.) (filed Aug. 4, 2015); *Robert W. Mauthe, M.D., P.C. v. Versa Cardio, LLC*, No. CIV. A. 3:15-657-JMM (M.D. Pa.) (filed Apr. 2, 2015; transferred to E.D. Pa. and docketed at No. CIV. A. 16-570-JLS); *Robert W. Mauthe, M.D., P.C. v. MedTech Imaging, Inc.*, No. CIV. A. 3:15-656-JMM (M.D. Pa.) (filed Apr. 2, 2015).

"National Education Webinar Series 2017." Def.'s Facts at ¶ 18; Pl.'s Resp. at ¶ 18. Directly below

this header, the fax states:

> **The Value of Medication Monitoring:**
> **Workers' Compensation Claimants and Systems**
> Thursday, May 25, 2017 | 10AM PT, 11AM MT, 12PM CT, 1PM ET
>
> According to the latest Worker's Compensation Research Institute Opioid Study a
> large percentage of injured workers (54–86%) receiving pain medications received
> opioids across the 25 states studied. Numerous guidelines have been published to
> address the appropriate utilization of opioid therapy in the worker's compensation
> population. This presentation will highlight national trends in opioid misuse and
> abuse, discuss patient selection and discuss the role of medication monitoring as a
> valuable tool that provides objective, actionable information during the care of
> injured workers.
>
> Learning Objectives:
> 1. Describe trends in opioid misuse and abuse
> 2. Discuss the current landscape in use of opioids for chronic pain
>    management
> 3. Discuss guidelines created specifically for worker's compensation
> 4. Identify risk factors for substance misuse and abuse
>
> Register here: http://bit.ly/2oJvFam

Def.'s Facts at ¶ 19; Pl.'s Resp. at ¶ 19. Below the description of the webinar and its objectives,

the fax contains a headshot of the host of the seminar, and it also provides her biographical

information:

> Maria Chianta, Pharm.D. Director of Clinical Affairs, Managed Markets for
> Millennium Health began her career in community pharmacy. She began working
> for an international pharmaceutical and medical device manufacturer where she
> directed medical information and global post-marketing surveillance systems
> operations for many years. She transitioned into Clinical Affairs to pursue her
> passion for education on the value of clinical products. Currently, Dr. Chianta
> provides clinical expertise and leadership in developing clinical education tools and
> services supporting appropriate utilization of Millennium Health's offerings to
> improve patient, provider, payer and societal outcomes. She educates nationally on
> the value of appropriate clinical medication monitoring and pharmacogenetic
> testing. During her time at Millennium Health, she has collaborated with many
> payer organizations and has given numerous lectures nationally on the appropriate
> utilization of urine drug testing and pharmacogenetic testing to help improve care

5

for injured workers. She serves as a preceptor for pharmacy students from Southern
Illinois Edwardsville School of Pharmacy.

Def.'s Facts at ¶ 21; Pl.'s Resp. at ¶ 21.

Below Dr. Chianta's biography, the fax provides short descriptions of three other

educational webinars that are archived on the defendant's website.

**Urine Drug Testing Interpretation: A Toxicologist's Perspective on Common
Clinical Challenges**
featuring Javier Velasco, PhD and William Bundy, PharmD
Interpreting urine drug testing (UDT) results can present clinicians [with] a host of
challenges. This case-based program, led by toxicologists, will highlight common
challenging scenarios, giving clinicians a greater understanding of each to support
improved clinical decision making.

**Trends in Opioid Misuse and Abuse**
featuring Jeff Fudin, PharmD and Leah LaRue, PharmD
Dr. Jeffrey Fudin and Dr. Leah LaRue illustrate recent trends in both prescription
and illicit opioid use, as well as discuss pharmacology and physical effects.

**Appropriate Urine Drug Testing in Substance Use Disorders: Clinical
Consensus Recommendations**
featuring Andrew Barthwell, MD and Steven Passik, PhD
When used appropriately, urine drug testing and medication monitoring in
substance use disorders can provide objective data that healthcare practitioners may
employ in diagnosis, active treatment, and recovery phases of care. This
presentation will focus on a review of clinical indicators, scientific method, patient-
centered substance use testing, and the recommendations on testing from the
clinical consensus project.

Def.'s Facts at ¶ 25; Pl.'s Resp. at ¶ 25.

The plaintiff did not receive any fax transmissions from the defendant relating to the

webinar other than the single, one-page fax the plaintiff received on May 2, 2017. Def.'s Facts at

¶ 28; Pl.'s Resp. at ¶ 28. The plaintiff did not receive any fax transmissions inviting attendance at

any other webinars hosted by the defendant. Def.'s Facts at ¶ 29; Pl.'s Resp. at ¶ 29. The defendant

did not make any follow-up communications to the plaintiff after sending the May 2, 2017 fax.

Def.'s Facts at ¶ 30; Pl.'s Resp. at ¶ 30. The plaintiff has not received any advertisements or

marketing materials from the defendant since May 25, 2017, the date of the webinar. Def.'s Facts at ¶ 31; Pl.'s Resp. at ¶ 31.

The defendant's corporate designee testified that the purpose of the fax was to increase awareness of the defendant's education offerings. Def.'s Facts at ¶¶ 20, 26, 34 (citing Def.'s Facts, Ex. C, Dep. Tr. of Maria Guevara dated July 11, 2019 ("Guevara Dep.") at 19:10-20:5; 29:14-18, Doc. No. 61-8); Pl.'s Resp. at ¶¶ 20, 26, 34. The defendant stopped producing webinars on September 13, 2017 and has discontinued its educational webinar program. Def.'s Facts at ¶ 37; Pl.'s Resp. at ¶ 37.

### B.   Registering for the Seminar

The defendant collected each webinar registrant's name, email address, occupation, practice name, practice address, clinical specialty, work telephone number, NPI number, and registration date. Def.'s Facts at ¶ 60; Pl.'s Resp. at ¶ 60. The defendant did not use any of the information it collected from fax recipients who registered for the webinar for marketing or advertising. Def.'s Facts at ¶ 61; Pl.'s Facts at ¶ 61. Fifty-four people registered for the webinar. Def.'s Facts at ¶ 59; Pl.'s Resp. at ¶ 59. Twenty-seven people viewed the webinar during its live broadcast. Def.'s Facts at ¶ 59; Pl.'s Facts at ¶ 59. The May 25, 2017 webinar is archived on the defendant's website and may be viewed for free at any time in its archives. Def.'s Facts at ¶ 63; Pl.'s Resp. at ¶ 63.

### C.   The Webinar Presentation

The webinar took place on May 25, 2017. Def.'s Facts at ¶ 19; Pl.'s Resp. at ¶ 19. The defendant selected the topic of the May 25, 2017 webinar, in part, based on questions from workers' compensation healthcare providers and based on its review of recently published medical literature. Def.'s Facts at ¶ 39; Pl.'s Resp. at ¶ 39. The presentation included a 44-slide PowerPoint

presentation and Dr. Chianta's written script of talking points. Def.'s Facts at ¶ 42; Pl.'s Resp. at ¶ 42. Viewers could only see the PowerPoint slides, not Dr. Chianta's notes. Def.'s Facts at ¶ 44; Pl.'s Resp. at ¶ 44.

Dr. Chianta was responsible for creating the content of the webinar. Def.'s Facts at ¶ 40; Pl.'s Resp. at ¶ 40. In May 2017, Dr. Chianta was the defendant's Director of Clinical Affairs, Managed Markets Lead. Def.'s Facts at ¶ 23; Pl.'s Resp. at ¶ 23. Dr. Chianta currently serves as the National Director of Managed Markets Medical Liaison for the defendant. Def.'s Facts at ¶ 22; Pl.'s Resp. at ¶ 22. In creating the webinar, Dr. Chianta relied on her own independent research and the publicly available body of medical information. Def.'s Facts at ¶ 40; Pl.'s Resp. at ¶ 40. Dr. Chianta consulted with Maria Guevara, the defendant's Director of Clinical Affairs for Education and Training, about the content and themes of the webinar. Def.'s Facts at ¶ 41; Pl.'s Resp. at ¶ 41. The defendant's Clinical Affairs Department was primarily responsible for developing the visual presentation and script for each of the webinars discussed on the fax. Def.'s Facts at ¶ 33; Pl.'s Facts at ¶ 33. The marketing department was responsible for placing the webinars on the defendant's website for on-demand viewing. Pl.'s Add'l Facts at ¶ 13; Def.'s Resp. at ¶ 13.

The third PowerPoint slide of the presentation lists four objectives for the webinar:

(1) Describe trends in opioid misuse and abuse; (2) Discuss the current landscape in the use of opioids for chronic pain management; (3) Discuss guidelines created specifically for workers' compensation; (4) Identify risk factors for substance misuse and abuse.

Def.'s Facts at ¶ 45; Pl.'s Resp. at ¶ 45.

## III.     DISCUSSION

### A.     <u>Standard of Review – Motion for Summary Judgment</u>

A district court "shall grant summary judgment if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Additionally, "[s]ummary judgment is appropriate when 'the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law.'" *Wright v. Corning*, 679 F.3d 101, 103 (3d Cir. 2012) (quoting *Orsatti v. New Jersey State Police*, 71 F.3d 480, 482 (3d Cir. 1995)). An issue of fact is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" when it "might affect the outcome of the suit under the governing law." *Id.*

The party moving for summary judgment has the initial burden of "informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). Once the moving party has met this burden, it is up to the non-moving party to counter with "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenish Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks and citation omitted); *see* Fed. R. Civ. P. 56(c) (stating that "[a] party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . . or . . . showing that the materials cited do not establish the absence. . . of a genuine dispute"). The non-movant must show more than the "mere

scintilla of evidence" for elements on which the non-movant bears the burden of production. *Anderson*, 477 U.S. at 252. "[B]are assertions, conclusory allegations, or suspicions" are insufficient to defeat summary judgment. *Fireman's Ins. Co. v. DuFresne*, 676 F.2d 965, 969 (3d Cir. 1982). Additionally, the non-moving party "cannot rely on unsupported allegations, but must go beyond pleadings and provide some evidence that would show that there exists a genuine issue for trial." *Jones v. United Parcel Serv.*, 214 F.3d 402, 407 (3d Cir. 2000). Thus, it is not enough to "merely [] restat[e] the allegations" in the complaint; instead, the non-moving party must "point to concrete evidence in the record that supports each and every essential element of his case." *Jones v. Beard*, 145 F. App'x 743, 745–46 (3d Cir. 2005) (citing *Celotex*, 477 U.S. at 322). Moreover, arguments made in briefs "are not evidence and cannot by themselves create a factual dispute sufficient to defeat a summary judgment motion." *Jersey Cent. Power & Light Co. v. Twp. of Lacey*, 772 F.2d 1103, 1109–10 (3d Cir. 1985).

"When considering whether there exist genuine issues of material fact, the court is required to examine the evidence of record in the light most favorable to the party opposing summary judgment, and resolve all reasonable inferences in that party's favor." *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). The court must decide "not whether . . . the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Anderson*, 477 U.S. at 252. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial" and the court should grant summary judgment in favor of the moving party. *Matsushita Elec. Indus. Co.*, 475 U.S. at 587 (citation and internal quotation marks omitted). Nonetheless, when one party's claims are "blatantly contradicted by the record, so that no reasonable jury could believe

[them]," the court should not take those claims as true for the "purposes of ruling on a Motion for Summary Judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

### B.      Analysis

The TCPA prohibits "any person within the United States, or any person outside the United States if the recipient is within the United States" from "us[ing] any telephone facsimile machine, computer, or other device to send, to a telephone facsimile machine, an unsolicited advertisement[.]" 47 U.S.C. § 227(b)(1)(C). The TCPA defines an "unsolicited advertisement" as "any material advertising the commercial availability or quality of any property, goods, or services which is transmitted to any person without that person's prior express invitation or permission, in writing or otherwise." 47 U.S.C. § 227(a)(5). The TCPA does not indicate whether advertisements for free goods or services constitute "unsolicited advertisements." In a 2006 order[2] interpreting "unsolicited advertisement" under the TCPA, the FCC concluded that certain faxes that "promote goods or services even at no cost," including free seminars, qualify as advertisements under the TCPA because "[i]n many instances, 'free' seminars serve as a pretext to advertise commercial products and services." *See In re Rules & Regs. Implementing the Tel. Consumer Protection Act of 1991*, 21 FCC Rcd. 3787, 3814 (2006).

To determine whether the May 2, 2017 fax constitutes an unsolicited advertisement, the court addresses a series of four questions. First, was the fax unsolicited? The court concludes that the fax was unsolicited. Second, is the fax an advertisement on its face? The court concludes that the fax is not an advertisement on its face, because it promotes a free seminar, rather than any commercially available product. Third, since the fax is not an advertisement on its face, should the

---

[2] For the purposes of this opinion, we call this document an order and "assume without deciding that the Order is a 'final order,'" *PDR Network, LLC v. Carlton & Harris Chiropractic, Inc.*, 139 S. Ct. 2051, 2055 (2019), because neither party provides any evidence to contend that it is not a final order.

court apply a pretext analysis, given the relevant portion of the 2006 FCC order concerning free seminars? The court concludes that it need not adopt the relevant portion of the 2006 FCC order and apply the pretext analysis. Fourth, does the 2006 FCC order apply in some way such that the court must peel back the curtain and dig beyond the face of the fax? The court concludes that it does not need to examine beyond the face of the fax to conclude that the fax is not an unsolicited advertisement. The court addresses each question in turn.

### 1.      Was the Fax Unsolicited?[3]

A fax is not unsolicited when a person gives his "prior express invitation or permission, in writing or otherwise" to receive a fax. 47 U.S.C. § 227(a)(5). An "express invitation or permission" is interchangeable with "express consent." *Phys. Healthsource, Inc. v. Cephalon, Inc.*, 954 F.3d 615, 621–22 (3d Cir. 2020). A fax recipient manifests "express consent" to receive faxes from a sender when he voluntarily provides his fax number prior to receiving the fax and when the fax he receives is related to the reason he originally provided his fax number. *See id.* at 619 ("The voluntary provision of a number—phone or fax—by a message-recipient to a message-sender constitutes express consent such that a received message is *solicited* and thus not prohibited by the TCPA, if the message relates to the reason the number was provided." (citations omitted)).

The Third Circuit examined whether two faxes were unsolicited advertisements in *Physicians Healthsource, Inc. v. Cephalon, Inc.* In *Physicians Healthsource*, a doctor received two faxes from a pharmaceutical company inviting him to partake in a dinner and a lunch where the

---

[3] The parties did not raise this argument in their briefs. However, the Third Circuit issued an opinion on this point after briefing and oral argument. *See Physicians Healthsource, Inc. v. Cephalon, Inc.*, 954 F.3d 615 (3d Cir. 2020) (finding that fax was not unsolicited, and, therefore, did not violate the TCPA, because plaintiff gave his business card to defendant with his fax number for purpose of receiving additional information from pharmaceutical representatives). Given this development, the court finds it relevant to address this matter. Though the court raises the matter *sua sponte*, it does not grant the motion on these grounds, and, therefore, did not need to give the parties notice and reasonable time to respond. *See* Fed. R. Civ. P. 56(f)(2) ("After giving notice and a reasonable time to respond, the court may . . . grant the motion on grounds not raised by a party[.]").

company planned to promote its products. *See id.* at 617 ("The first fax at issue, addressed to Dr. Martinez, was an invitation to a dinner meeting program on a drug called AMRIX®. The second fax was an invitation to a promotional product lunch on FENTORA®."). The parties did not dispute that the doctor willingly gave his fax number to the defendant "in part, for the purpose of having drug representatives be in contact and provide follow-up information." *Id.* at 620, n.6. Ultimately, the Third Circuit found that the two faxes were not unsolicited, because the doctor willingly gave his fax number, and the two faxes were related to one of the reasons the doctor gave his fax number to the defendant. *See id.* at 619 (affirming lower court's decision to grant summary judgment).

Here, in applying the logic of *Physicians Healthsource* to determine if the fax the plaintiff received on May 2, 2017 was unsolicited, this court considers two questions. First, did the plaintiff give the defendant express consent to send the fax through "voluntary provision" of the plaintiff's fax number? Second, if the plaintiff gave express consent to the defendant, does the May 2, 2017 fax "relate[] to the reason the number was provided?" *Id.*

The court first examines whether the plaintiff gave the defendant the fax number. The plaintiff and the defendant had a relationship prior to May 2, 2017. The plaintiff had previously submitted some patients' urine specimens to the defendant for urine drug testing services. Pl.'s Resp. to Def. Millennium Health, LLC's Mot. for Summ. J. ("Pl.'s Br.") at 2, Doc. No. 66; Def.'s Facts at ¶ 14; Pl.'s Resp. at ¶ 14; Pl.'s Add'l Facts at ¶ 18. For this reason, the plaintiff provided the defendant with the plaintiff's fax number prior to May 2, 2017. Def.'s Facts at ¶ 14; Pl's Resp. at ¶ 14.

The court next turns to the question of whether the May 2, 2017 fax related to the reason the plaintiff initially gave the defendant the fax number. In *Physicians Healthsource*, "visiting [pharmaceutical] representatives would 'sometimes ask' [the doctor] if they could follow up and

send him 'things.'" 954 F.3d at 625 (Porter, J., dissenting) (citation omitted). In this case, the plaintiff voluntarily provided the defendant with the fax number for a very limited purpose: to obtain the results of patients' urine drug tests. Pl.'s Br. at 2. The May 2, 2017 fax concerned a webinar entitled "The Value of Medication Monitoring: Workers' Compensation Claimants and Systems." Def.'s Facts at ¶¶ 1, 3; Pl.'s Add'l Facts at ¶ 1. Nothing in the record demonstrates that there was in-person communication between the plaintiff and the defendant, or that the defendant specifically asked in any way if it could send the plaintiff information beyond urine drug analyses via fax. It is only evident that the plaintiff gave the defendant the fax number for the limited purpose of obtaining urine drug analysis results and information. Pl.'s Br. at 2; Def.'s Facts at ¶ 14; Pl.'s Resp. at ¶ 14; Pl.'s Add'l Facts at ¶ 18. Therefore, in this case, unlike in *Physicians Healthsource*, the fax extended beyond the limited purpose for which the plaintiff originally gave the defendant the fax number.

Even if the court could draw some haphazard line between the plaintiff's original purpose in giving the defendant the fax number and the May 2, 2017 fax, the plaintiff's vulnerability for receiving unsolicited faxes would erase it. "[D]ue to patient privacy laws, healthcare professionals still rely on faxes for certain communications[,]" which "renders them a very captive and easily identifiable audience" for faxed advertisements "as one of the few subgroups in the population that still commonly employ the use of a fax machine." *Fischbein*, 2020 WL 2505178, at *3. The vulnerability of healthcare professionals to unsolicited faxed advertisements reinforces the court's conclusion that the plaintiff's decision to give the defendant the fax number for the purpose of receiving patients' urine drug analyses does not constitute permission to send faxes that are unrelated to patients' test results.

## 2.      Is the Fax an Advertisement on its Face?

The TCPA defines an "advertisement" as "any material advertising the commercial availability or quality of any property, goods, or services which is transmitted to any person[.]" 47 U.S.C. § 227(a)(5). "[T]o be an ad, the fax must promote goods or services to be bought or sold, and it should have profit as an aim." *Robert W. Mauthe M.D., P.C. v. Spreemo, Inc.*, No. 19-1470, 2020 WL 1492987, at *2 (quoting *Mauthe v. Optum Inc.*, 925 F.3d 129, 133 (3d Cir. 2019)). "At a minimum" for a fax to constitute a TCPA violation "it must directly or indirectly inform the recipient that the sender or some other entity sells something of value" and that the "seller is trying to make a sale to" the fax recipient. *Mauthe v. Nat'l Imaging Assocs., Inc. ("NIA")*, 767 F. App'x 246, 249 (3d Cir. 2019) (unpublished).

The Third Circuit has developed two tests to determine whether a fax constitutes a TCPA violation. The first test—the direct purchaser test—applies when a sender sends an unsolicited advertisement to an individual who is the direct purchaser of the sender's goods, products or services. *See id.* (describing the test).[4] The second test—the third-party liability test—applies when a sender sends an unsolicited advertisement to an individual or entity that is not the direct

---

[4] The Third Circuit established the direct purchaser test in *NIA*, indicating:

> [T]he fax either must (1) notify a potential buyer that he or she can purchase a product, goods, or services from the sending entity or perhaps another seller, *see* [*Sandusky Wellness Ctr., LLC v. Medco Health Sols., Inc.*, 788 F.3d 218, 222 (6th Cir. 2015)] or (2) induce or direct a willing buyer to seek further information through a phone number, an email address, a website or equivalent method for the purposes of making a purchase, *see Holtzman v. Turza*, 728 F.3d 682, 685–87 (7th Cir. 2013); *Chesbro v. Best Buy Stores, L.P.*, 705 F.3d 913, 918 (9th Cir. 2012). Thus, the fax must convey the impression to its recipient that a seller is trying to make a sale to him.

767 F. App'x at 249.

The court recognizes that this test is not binding upon this court. *See Fallon Elec. Co., Inc. v. Cincinnati Ins. Co.*, 121 F.3d 125, 128 n.1 (3d Cir. 1997) ("[T]he Court does not regard [unpublished] opinions as binding precedent." (citing Third Circuit Internal Operating Procedures ch. 5.8 (1994)); *see also Watcher v. Pottsville Area Emergency Med. Servs, Inc.*, 248 F. App'x 272, 275 n.5 (3d Cir. 2007) ("As we have previously stated, nonprecedential opinions are just that, they are not binding precedent on this court." (internal citation omitted)). However, this court regards *NIA* as persuasive and instructive in cases dealing with faxes sent to potential direct purchasers.

purchaser, but could motivate another party to purchase the sender's goods, products or services. *See Optum*, 925 F.3d at 133 (describing the test).[5]

a.    <u>Determining Which Test Applies</u>

The parties disagree on the test the court should apply in the instant case. *Compare* Pl.'s Br. at 13 (arguing that "Defendant's motion incorrectly presupposes that the Third Circuit's holding in *Mauthe v. NIA*, rather than the Third Circuit's holding in *Mauthe v. Optum, Inc.*, governs the resolution of this case" (emphasis omitted)), *with* Def. Millennium Health, LLC's Reply in Supp. of Mot. for Summ. J. ("Def.'s Reply Br.") at 2, Doc. No. 70 ("The Third Circuit's two-part test articulated in *Mauthe v. NIA* governs Mauthe's TCPA claim because the fax was targeted at clinicians who directly use urine drug testing services in treating their patients[.]" (emphasis omitted)). The plaintiff claims that the third-party liability test applies because "clinicians' patients, and those patients' insurers, were the likely and primary payors of Defendant's" urine drug analysis products. Pl.'s Br. at 13. The defendant claims that the direct purchaser test applies because the plaintiff "ha[d] the decision[]making power over whether to use the fax sender's services." Def.'s Reply Br. at 3.

The court will apply the direct purchaser test, though not for the reasons cited by the defendant. The defendant's argument is unpersuasive given the Third Circuit's recent decision in *Robert W. Mauthe M.D., P.C. v. Spreemo, Inc.* In *Spreemo*, the defendant, "a medical diagnostic

---

[5] In *Optum*, the court held that

> to establish third-party based liability under the TCPA a plaintiff must show that the fax: (1) sought to promote or enhance the quality or quantity of a product or services being sold commercially; (2) was reasonably calculated to increase the profits of the sender; and (3) directly or indirectly encouraged the recipient to influence the purchasing decisions of a third party. As we explained in *NIA*, "the fax must convey the impression . . . that a seller is trying to make a sale."

925 F.3d at 133 (internal quotation marks and citation omitted).

services vendor," sent a fax that read "Spreemo is the 'Primary Diagnostic Vendor' for Hartford [Financial Services Group, Inc.]." 2020 WL 1492987, at *1. Hartford Financial Services Group, Inc., is a health insurance provider. *Id.* Dr. Mauthe brought a TCPA action alleging that the fax constituted an unsolicited advertisement. *Id.*

To determine if Spreemo's fax was an advertisement, the Third Circuit applied the third-party liability test, because the facts of *Spreemo* mirrored an example of third-party liability the court gave in *Optum*. *Id.* at *2 n.4. The *Optum* court's "example of" third-party liability was "a fax sent to a doctor encouraging the doctor to prescribe a particular drug to the doctor's patients who, rather than the doctor, are the likely purchasers of the sender's product." *Optum*, 925 F.3d at 133. The court found that the fax in *Spreemo* resembled this example because "the fax was sent to a medical doctor." 2020 WL 1492987, at *2. Choosing not to apply the third-party liability test in *Spreemo* would render "the doctor-patient example in *Optum* . . . invalid, as most drugs prescribed by doctors are also 'paid for' by insurance companies." *Id.*

The defendant argues that this court must apply the third-liability test because "[t]here is simply no evidence that either the patients or their insurers have any say in a clinician's decision to use (or not use) [urine drug testing] services of any particular provider." Def.'s Reply Br. at 3. However, this is not true. The defendant's corporate designee testified that "factors, including whether a patient has insurance coverage, what that insurance coverage provides, [and] whether they were in network or out of network with certain insurers" dictates the cost of the defendant's urine drug testing products and services. Pl.'s Add'l Facts at ¶ 17 (quoting Guevara Dep. at 63:12-17); Def's Resp. at ¶ 17. Based on the corporate designee's testimony, it is possible (if not probable) that the insurer, rather than the clinician, would pay for the defendant's urine drug analysis services. Therefore, based on the logic of *Spreemo* and the *Optum* doctor-patient example,

17

the defendant's arguments for why the court ought to apply the direct purchaser test do not pass muster.

Nonetheless, the court applies the direct purchaser test because the May 2, 2017 fax did not promote defendant's urine drug testing services, but rather, promoted a free seminar offered directly to the plaintiff.[6] This fax and the related seminar were intended for clinicians, like the plaintiff, not patients or insurers. *See* Def.'s Facts at ¶ 34 ("The general purpose of Millennium Health's webinar series was to increase educational awareness among clinicians."); Pl.'s Resp. at ¶ 34 (admitting that this was the purpose); Guevara Dep. 29:14–18 (indicating that defendant included information about archived webinars "[s]o that *clinicians*, if they were interested in other programs that they thought might be relevant to them, they could go on and watch them." (emphasis added)).

### b.    Applying the Direct Purchaser Test

Having determined which test applies, the court applies the direct purchaser test to the facts of this case.[7] The court concludes that, on its face, the fax is not an advertisement. To constitute an "advertisement" the fax needs to "advertis[e] the *commercial* availability or quality of any property, goods, or services." 47 U.S.C. § 227(a)(5) (emphasis added). But the fax and the link associated with the fax only discuss a free seminar, not any property, goods, or services which are

---

[6] In this portion of the opinion, the court only examines the face of the fax itself. If the court engaged in a pretext analysis and examined what the defendant promoted during the free seminar or on the website associated with the free seminar, the court might construe the urine drug testing services to be the product sold by the defendant. The court is not engaging in a pretext analysis.

[7] The defendant argues that the plaintiff "has waived the opportunity to argue the Fax is *not* an advertisement under the 'direct' theory of TCPA liability" because the plaintiff "dismisses the *NIA* test entirely[.]" Def.'s Reply Br. at 4. The court disagrees. Ultimately, the direct purchaser test and the third-party liability test encompass the same behavior: the illicit sending of unsolicited advertisements via fax. The entire thrust of the plaintiff's argument revolves around the notion that the fax was an unsolicited advertisement. Therefore, the court does not consider this argument waived.

commercially available. Thus, the fax neither "promote[s] goods or services to be bought or sold," nor has "profit as an aim." *Optum*, 925 F.3d at 133. It also does not

> (1) notify a potential buyer that he or she can purchase a product, goods, or services from the sending entity or perhaps another seller, or (2) induce or direct a willing buyer to seek further information through a phone number, an email address, a website or equivalent method for the purposes of making a purchase.

*NIA*, 767 F. App'x at 249.

The fax does not indicate that the plaintiff can purchase any product at all. The heading of the fax reads "National Education Webinar Series 2017" and includes a small Millennium Health logo in the top right corner. Am. Compl., Ex. A. The fax promotes a free seminar entitled "The Value of Medication Monitoring: Workers' Compensation Claimants and Systems." *Id.* It also provides a brief description of the seminar's background, purpose, and objectives. *Id.* The background section explains that "a large percentage of injured workers (54–86%) receiving pain medications received opioids across [] 25 states studied. Numerous guidelines have been published to address the appropriate utilization of opioid therapy in the worker's compensation population." *Id.* The fax explains that the seminar's purpose is to "highlight national trends in opioid misuse and abuse, discuss patient selection and discuss the role of medication monitoring as a valuable tool that provides objective, actionable information during the care of injured workers." *Id.* The fax identifies the seminar's objectives as follows: "1. Describe the trends in opioid misuse and abuse"; "2. Discuss the current landscape in use of opioids for chronic pain management"; "3. Discuss guidelines created specifically for worker's compensation"; "4. Identify risk factors for substance misuse and abuse." *Id.* These stated objectives comport with the defendant's goal of the seminar which was to "increase educational awareness among clinicians." Def.'s Facts at ¶ 34; Pl.'s Resp. at ¶ 34. After these stated objectives, the fax provides a registration link for recipients. Am. Compl., Ex. A.

The fax also includes a brief section with biographical information about the seminar's host, Dr. Chianta. *Id.* The fax mentions that "medication monitoring" exists as a "valuable tool that provides objective, actionable information during the care of injured workers." *Id.* Finally, the fax includes a link to and description of previous seminars it has held. These descriptions are very brief. The webinars are entitled "Urine Drug Testing Interpretation: A Toxicologist's Perspective on Common Clinical Challenges"; "Trends in Opioid Misuse and Abuse" and "Appropriate Urine Drug Testing in Substance Use Disorders: Clinical Consensus Recommendations." *Id.*

The fax does not indicate that the defendant, or any other entity, is selling any product. The only possible indication that the defendant sells anything at all is a nebulous mention of "Millennium Health's offerings" in Dr. Chianta's bio. *See id.* ("Dr. Chianta provides clinical expertise and leadership in developing clinical education tools and services supporting appropriate utilization of Millennium Health's offerings to improve patient, provider, payer and societal outcomes."). There is no indication that the fax is pushing the recipient to purchase "Millennium Health's offerings" or even that such offerings are available for sale to the recipient.

The plaintiff argues that the repeated use of the term "value" renders the fax an advertisement. However, the fax only indicates that medication monitoring is valuable. The fax never connects the defendant to medication monitoring. The fax does not indicate that "Millennium Health's offerings" include medication monitoring, or that these vague "offerings" are valuable.

The plaintiff also argues that the links provided for the seminars and archived seminars render the fax an advertisement. However, the links do not "induce or direct a willing buyer to seek further information through . . . a website or equivalent method *for the purposes of making a purchase*." *NIA*, 767 F. App'x at 249 (emphasis added). The links listed direct the plaintiff to a

webpage entitled "Educational Programs."[8] Pl.'s Facts, Ex. D-1. This webpage lists all of the defendant's free seminars, brief descriptions of the seminars, the seminars' objectives, and a way to access them. *Id.* The page explains that "Millennium Health is dedicated to advancing best practices and supporting improved patient outcomes through education. Millennium Health continues to offer clinically relevant resources and educational opportunities." *Id.* The page does not mention any of Millennium's commercially available products. This webpage—much like the fax associated with it—does not indicate that the defendant offers any products that the fax recipient could purchase, beyond free seminars.[9]

---

[8] The defendant argues that this information is "inadmissible hearsay and should not be considered by the Court" because it is from a declaration which was not adduced during discovery. Def.'s Resp. at ¶ 20. Inadmissible hearsay may not be considered for purposes of summary judgment. *See Smith v. City of Allentown*, 589 F.3d 684, 693 (3d Cir. 2009) ("Hearsay statements that would be inadmissible at trial may not be considered for purposes of summary judgment." (internal citation omitted)); *J.F. Feeser, Inc. v. Serv-A-Portion, Inc.*, 909 F.2d 1524, 1542 (3d Cir. 1990) ("We thus concluded that hearsay evidence produced in an affidavit opposing summary judgment may be considered if the out-of-court declarant could later present the evidence through direct testimony, i.e. in a form that 'would be admissible at trial.'" (internal citation omitted)). However, hearsay can be considered on summary judgment if it can be presented in a form that is admissible at trial. *See Williams v. Allstate Ins. Co.*, Civ. A. No. 8-1160, 2009 WL 1099160, at *2 n.1 (W.D. Pa. Apr. 23, 2009) ("[I]t is well-established in this jurisdiction that the nonmoving party does not have to produce evidence in a form that would be admissible at trial to avoid summary judgment." (internal citation omitted)).

"The burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated." Fed. R. Civ. P. 56(c)(2), advisory committee's note. Here, the plaintiff submitted an affidavit from one of the plaintiff's attorneys. *See* Pl.'s Br., Ex. B (affirming that Molly E. Stemper is associate with Bock, Hatch, Lewis & Oppenheim, LLC). Affidavits opposing motions for summary judgment "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). A declaration or affidavit from an attorney representing a party in the case must meet the same requirements as a declaration from any other witness.

Ms. Stemper's affidavit meets the Rule 56(c)(4) requirements. Ms. Stemper made this record based on her personal knowledge and demonstrates she is competent to testify. The court does not find that this evidence is inadmissible. Ms. Stemper's affidavit suffices to demonstrate authenticity. *See* Fed. R. Evid. 901(a) ("The requirement of authentication . . is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims."). Additionally, the court does not find Ms. Stemper's statements or the screenshots of the website to be hearsay. If the court held a trial, Ms. Stemper would testify on the stand to the facts she swears to in this affidavit. Such testimony would not be hearsay. *See* Fed. R. Evid. 803(c) ("'Hearsay' means a statement that . . . the declarant does not make while testifying at the current trial or hearing[.]"). Additionally, the screenshots are not hearsay because they are statements from Millennium Health, the plaintiff's party opponent. *See* Fed. R. Evid. 803(d)(2)(A) (providing that a statement "offered against an opposing party" that "was made by the party in an individual or representative capacity" is not hearsay).

[9] The court does not examine the webpages that are linked to this initial webpage. In this portion of the opinion, the court only examines whether the fax is an unsolicited advertisement on its face. While this includes an analysis of whether the fax "induce[s] or direct[s] a willing buyer to seek further information through . . . a website or equivalent method for the purposes of making a purchase," the analysis does not require that the court look even further behind the curtain and examine the links that come after the initial link. *NIA*, 767 F. App'x at 249.

Because the fax does not "promote goods or services to be *bought or sold*," the court concludes that the fax is not an advertisement on its face. *Optum*, 925 F.3d at 133 (emphasis added); *see also* 47 C.F.R. § 64.1200(f)(1) (defining "advertisement" as "any material advertising the *commercial availability* or quality of any property, goods, or services" (emphasis added)). The fax highlights only a free seminar, not any product that was commercially available to the fax recipient. Although the Third Circuit has not directly addressed a fax which promoted a free seminar, this court's decision parallels the decisions of some other courts that have determined that when the subject of a fax "is not commercially available" it is not "an unsolicited advertisement[] within the meaning of the [TCPA]." *N.B. Indus., Inc. v. Wells Fargo & Co.*, 465 F. App'x 640, 642 (9th Cir. 2012) (finding fax which described award and application for award, and encouraged recipients to apply, was not violation of TCPA); *see also Phillips Randolph Enters., LLC v. Adler-Weiner Research Chicago, Inc.*, 526 F. Supp. 2d 851, 853 (N.D. Ill. 2007) (finding fax promoting new research study on health care program was not TCPA violation); *Ameriguard, Inc. v. Univ. of Kan. Med. Ctr. Research Inst.*, No. 06-369-CV-W-ODS, 2006 WL 1766812, at *1 (W.D. Mo. June 23, 2006) (finding fax seeking participants in trial study was not advertisement because nothing was commercially available to recipients). "The appropriate inquiry under the TCPA is not whether there is some ancillary commercial benefit to either party, but whether the message is an advertisement which tends to propose a commercial transaction." *Physicians Healthsource, Inc. v. Janssen Pharms., Inc.*, Civ. A. No. 12-2132 (FLW), 2013 WL 486207, at *4 (D.N.J. Feb 6, 2013). As the May 2, 2017 fax proposed no commercial transaction, it is not an advertisement.

### 3.      Should the Court Apply a Pretext Analysis?

The court now turns to the question of whether it must engage in a pretext analysis, despite the fact that the May 2, 2017 fax is not an advertisement on its face. As previously discussed, in 2006 the FCC issued an order interpreting the term "unsolicited advertisements" as encompassing faxes that "promote goods or services even at no cost," including faxes promoting free seminars because "[i]n many instances, 'free' seminars serve as a pretext to advertise commercial products and services." *See In re Rules & Regs. Implementing the Tel. Consumer Protection Act of 1991*, 21 FCC Rcd. 3787, 3814 (2006).

The Third Circuit has not adopted the FCC interpretation of the term "unsolicited advertisement." In *NIA*, the Third Circuit spoke on this issue.

> We want to make clear that we do not suggest that we endorse the pretext theory of liability under TCPA. We think that in almost all cases, a recipient of a fax could argue under the pretext theory that a fax from a commercial entity is an advertisement. The pretext theory, unless closely cabined, would extend TCPA's prohibition too far. But we need not explore the boundaries of pretext liability any further because Mauthe's claim could not survive the most expansive application of the pretext theory.

767 F. App'x at 250. In an accompanying footnote, the Third Circuit indicated that it was waiting to see how the Supreme Court ruled on the matter of pretext in an upcoming case. *See id.* at 250 n.5 ("It is unclear if we must follow the FCC's interpretation of the statute and adopt the pretext theory—in fact, in a different context the legal issue is currently before the Supreme Court in *PDR Network, L.L.C. v. Carlton & Harris Chiropractic, Inc.*, No. 17-1705 (filed June 21, 2018)."). Similarly, in *Mauthe v. Optum, Inc.* the Third Circuit noted that it did not "endorse[] . . . the pretext theory of liability under the TCPA, a matter that is still open" before the Supreme Court. 925 F.3d 129, 135 (2019). Unfortunately, the Supreme Court did not definitively answer whether lower

courts must adopt the pretext theory in its much-awaited decision in *PDR Network, LLC. v. Carlton & Harris Chiropractic, Inc. ("PDR Network I")*, 139 S. Ct. 2051 (2019).[10]

a.   <u>An Overview of *PDR Network I*</u>

Given the importance of *PDR Network I* in deciding whether to employ a pretext analysis, the court provides an overview of the case before applying its holding. The district court granted the defendant's motion to dismiss and held that it was not required to defer to the FCC's 2006 interpretation of "unsolicited advertisement" under *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), because the TCPA's definition of advertisement was unambiguous. *Carlton & Harris Chiropractic, Inc. v. PDR Network, LLC*, Civ. A. No. 3:15-14887, 2016 WL 5799301, at *4 (S.D. W. Va. Sept. 30, 2016). Because it found the term to be unambiguous, the district court interpreted the TCPA without adopting a pretext analysis, and found the fax was not an advertisement under the plain text of the statute. *Id.* at *5. For this reason, the court granted the motion to dismiss. *Id.*

The Fourth Circuit reversed the district court's decision. *See Carlton & Harris Chiropractic, Inc. v. PDR Network, LLC*, 883 F.3d 459 (2018). The Fourth Circuit's decision hinged on the Hobbs Act. The Hobbs Act gives federal courts of appeals, other than the Federal Circuit, "exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validity of" specific agency actions, including "all final orders of the Federal Communication Commission made reviewable by section 402(a) of title 47." 28 U.S.C. § 2342(1). The Hobbs Act also provides that "[a]ny party aggrieved by [a] final order may, within 60 days after its entry, file a petition to review the order in the court of appeals wherein venue lies." 28 U.S.C. § 2344. The

---

[10] Because the court refers to the Supreme Court's decision in *PDR Network* as well as the briefings in remanded *PDR Network*, which is currently before the Fourth Circuit, the court must differentiate between the two cases. The court refers to the Supreme Court decision as *PDR Network I* and the case currently pending before the Fourth Circuit as *PDR Network II*.

Fourth Circuit reasoned that the Hobbs Act imposes a "jurisdictional command" on "a district court to apply FCC interpretations of the TCPA." *PDR Network, LLC*, 883 F.3d at 466. Because of this inflexible "jurisdictional command", the Fourth Circuit determined the district court "erred when it eschewed the Hobbs Act's command in favor of *Chevron* analysis to decide whether to adopt the 2006 FCC Rule." *Id.* at 464.

The Supreme Court "explicitly declined to answer whether district courts were required to accept the FCC guidance at issue[.]" *Wilson v. Quest Diagnostics Inc.*, Civ. No. 2:18-11960, 2019 WL 4169012, at *2 (D.N.J. Sept. 3, 2019). The Court "found it difficult to answer" whether the Hobbs Act constitutes a jurisdictional command to employ the 2006 FCC order, because "the answer may depend upon the resolution of two preliminary issues" which the Fourth Circuit did not consider. *PDR Network I*, 139 S. Ct. at 2053. These two questions are:

> *First*, what is the legal nature of the 2006 FCC Order? . . . [I]s it the equivalent of a legislative rule, which . . . has the force and effect of law? . . . Or is it instead the equivalent of an interpretive rule, which simply advises the public of the agency's construction of the statutes and rules which it administers and lacks the force and effect of law? . . .
>
> *Second*, . . . did [the defendant] have a prior and adequate opportunity to seek judicial review of the Order?

*Id.* at 2055–56 (internal quotation marks, annotations, and citations omitted). The Court vacated the Fourth Circuit's opinion and remanded the case for the Fourth Circuit to consider these questions, because the Supreme Court is "a court of review, not of first review." *Id.* (internal quotation marks and citation omitted).

Though the Third Circuit intimated that it was waiting for *PDR Network I* before rendering a decision on the issue of pretext, *see NIA*, 767 F. App'x at 250 n.5, the Third Circuit has not commented on *PDR Network I* and has not applied a pretext analysis in any TCPA case. *See Spreemo, Inc.*, 2020 WL 1492987, at *1 ("We need not go beyond considering the fax in deciding

this case[.]"); *Optum*, 925 F.3d at 135 (indicating the court does not "endorse[] . . . the pretext theory of liability under the TCPA, a matter that is still open."); *NIA*, 767 F. App'x at 250 ("We want to make clear that we do not suggest that we endorse the pretext theory of liability under TCPA."). Because the Third Circuit has not yet provided guidance on whether this district court must abide by the 2006 FCC order, this court uses *PDR Network I* as a guide to determine whether the court must adopt the portion of the 2006 FCC order discussing free seminars and apply a pretext analysis.

The court's analysis proceeds in three steps. First, the court discusses constitutional concerns to inform its analysis of the Hobbs Act. Second, to answer *PDR Network I*'s initial question—whether the order is equivalent to a "legislative rule," which has the "force and effect of law," or an "interpretive rule," which "lacks the force and effect of law"—the court unpacks the difference between a legislative and interpretive order and determines which category applies to the 2006 FCC order. The court concludes that the order is interpretive. Third, the court turns to the subsequent *PDR Network I* question—whether the defendant had a "prior" and "adequate" opportunity to seek judicial review of the order—and analyzes whether it needs to answer this question at all. The court concludes that it does not need to answer this question, and, even if the court needed to address the question, it would conclude that the defendant lacked the requisite prior and adequate opportunity to seek judicial review.

b.    Constitutional Concerns[11]

Under the Hobbs Act, courts of appeals have "exclusive jurisdiction" to "enjoin, set aside, suspend (in whole or in part), or to determine the validity of" an agency order in a facial, pre-

---

[11] The court recognizes that it cannot invoke the canon of constitutional avoidance unless the statute "is found to be susceptible to more than one construction" after engaging in "ordinary textual analysis." *Nielsen v. Preap*, 139 S. Ct. 954, 972 (2019). In the subsequent analysis, the court finds that the statute unambiguously defines the term "advertisement." Therefore, the court does not need to employ constitutional avoidance. *See INS v. St. Cyr*, 533 U.S.

enforcement challenge. 28 U.S.C. § 2342. "All agree that this 'exclusive jurisdiction' language means, at a minimum that an aggrieved party may not bring a facial, pre-enforcement action either (1) in a district court or (2) more than 60 days after entry of the order." *PDR Network I*, 139 S.Ct. at 2063 (Kavanaugh, J., concurring). One way to interpret the exclusive jurisdiction of the Hobbs Act is that the Act "also bars judicial review of the agency's interpretation in subsequent enforcement proceedings" such that "the district court in an enforcement proceeding is required to follow the agency's interpretation when deciding the case, no matter how wrong the agency's interpretation might be." *Id.* If this were the case, "the District Court would have to afford the agency not mere *Skidmore* deference or *Chevron* deference, but absolute deference. Not *Skidmore* deference or *Chevron* deference, but *PDR* abdication." *Id.* at 2066 (citations omitted).

"*PDR* abdication" presents two constitutional concerns. First, "[b]arring defendants in as-applied enforcement actions from raising arguments about the reach and authority of agency rules enforced against them raises significant questions under the Due Process Clause." *Id.* at 2062; *see also Gorss Motels, Inc. v. Safemark Sys., LP*, 931 F.3d 1094, 1110 (11th Cir. 2019) (Pryor, J., concurring) (expressing concern that court's interpretation of Hobbs Act "prevents parties from raising arguments about the reach and authority of agency rules enforced against them[,]" thereby effectively granting "agency orders binding, issue-preclusive effect" in manner that chafes against due process (internal quotation marks and citation omitted)). Second, "*PDR* abdication" raises separation of powers concerns because it deprives the court of the judicial power to "'say what the law is' in particular cases and controversies." *Bank Markazi v. Peterson*, 136 S. Ct. 1310, 1322 (2016) (quoting *Marbury v. Madison*, 5 U.S. 137, 177 (1803)).

---

289, 300–01 (2001) ("[I]f an otherwise acceptable construction of a statue would raise serious constitutional problems, and where an alternative interpretation of the statute is fairly possible, [a court] is obligated to construe the statute to avoid such problems." (internal quotation marks and citations omitted)).

The court does not engage in "*PDR* abdication" in this case. Because the court concludes that the 2006 FCC order is interpretive, the court does not need to abide by the jurisdictional mandate of the Hobbs Act.

       c.        Is the Relevant Portion of the 2006 FCC Order Legislative or Interpretive?

"Legislative rules, which have the force of law, impose new duties upon the regulated party. Interpretive rules, on the other hand, seek only to interpret language already in properly issued regulations." *Pennsylvania Dep't of Human Servs v. United States*, 897 F.3d 497, 505 (3d Cir. 2018) (internal quotation marks and citations omitted). "[T]he hallmark of legislative rules" is "[e]xpanding the footprint of a regulation by imposing new requirements, rather than simply interpreting the legal norms Congress or the agency itself has previously created[.]" *Iowa League of Cities v. EPA*, 711 F.3d 844, 873 (8th Cir. 2013). "Interpretive rules do not add language to or amend language in the statute, but simply state what the administrative agency thinks the statute means, and only remind affected parties of existing duties." *Pennsylvania Dep't of Human Servs*, 897 F.3d at 505 (internal quotation marks and citations omitted).

Agencies enact legislative and interpretive rules through different procedural mechanisms. Typically, a legislative rule must undergo extensive notice-and-comment procedures. *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015). Section 4 of the APA, 5 U.S.C. § 553, sets forth a three-step process for notice and comment. *Id.* In step one, the agency "must issue a general notice of proposed rule making, ordinarily by publication in the Federal Register." *Id.* (citation and internal quotation marks omitted). In step two, "if notice is required, the agency must give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments." *Id.* (citation and internal quotation marks omitted). The agency "must consider and respond to significant comments received during the period of public comment." *Id.*

In step three, "when the agency promulgates the final rule, it must include in the rule's text a concise general statement of its basis and purpose." *Id.* (citation and internal quotation marks omitted). Interpretive rules do not require nearly as intensive a process as legislative rules, "[b]ut that convenience comes at a price: Interpretive rules do not have the force and effect of law and are not accorded that weight in the adjudicatory process." *Id.* at 97.

"To determine whether a rule is legislative or interpretive," courts typically "ask whether the agency intended to speak with the force of law." *Guedes v. Bureau of Alcohol, Tobacco, Firearms and Explosives*, 920 F.3d 1, 17 (D.C. Cir. 2019) (citations and internal quotation marks omitted). To deduce whether the agency intended to speak with the force of law, this court examines four pieces of information. First, "[c]entral to the analysis is the language actually used by the agency." *Id.* (citation and internal quotation marks omitted). Second, the court analyzes "whether the agency has published the rule in the Code of Federal Regulations[.]" *Id.* Third, the court examines "whether the agency has explicitly invoked its general legislative authority." *Id.* Finally, the court reviews whether the agency issued the relevant provision pursuant to notice-and-comment procedures. *See Perez*, 575 U.S. at 96 (differentiating legislative rules and interpretive rules based on whether rule underwent notice-and-comment procedures).

Based on these four criteria, the relevant portion of the 2006 FCC order is "best understood as interpretive rather than legislative." Br. for the United States as Amicus Curiae in Supp. of Appellant ("U.S. Br.") at 16, *PDR Network II*. Importantly, this conclusion comports with the logic the United States espoused in the amicus brief it filed in *PDR Network II*, which is still pending before the Fourth Circuit on remand from the Supreme Court.[12]

---

[12] Though the United States agrees that this portion of the order is an interpretive rule, the United States does not agree that the district court need not adopt the FCC's interpretive rule. The United States argues that some courts still apply the Hobbs Act to interpretive rules; the Hobbs Act allowed for prior, adequate opportunity for review; and construing

First, the passage's language demonstrates that it is interpretive rather than legislative. "[T]he order interprets the statutory definition of 'unsolicited advertisement' explaining that 'messages that promote goods or services even at no cost, such as free magazine subscriptions, catalogues, or free consultations or seminars are unsolicited advertisements *under the TCPA's definition*.'" *Id.* (quoting 21 FCC Rcd. At 3814 ¶ 52 (emphasis added)). This explanation "clarifie[s] the scope of an existing obligation rather than creating a new one." *Id.*

Second, the extrinsic evidence demonstrates that the relevant portion of the order is interpretive, not legislative. Had the FCC intended to create a new obligation, rather than explain the current state of the law, the FCC could have invoked its rulemaking authority. The Commission chose not to explicitly invoke such rulemaking authority. *Id.* at 18 ("Although the FCC has express authority to implement the TCPA, including by adopting legislative rules addressing the restriction on unsolicited fax advertisements . . . the Commission did not purport to exercise that authority in connection with the relevant portion of the 2006 order."). Third, the FCC also did not codify its interpretation in the Code of Federal Regulations. *Id.* at 19 ("[I]nterpretation was not codified in the Code of Federal Regulations." (citing *Guedes*, 920 F.3d at 18)).

Finally, the relevant portion of the 2006 order was not issued pursuant to "the full measure of notice and comment" procedures. *Id.* at 18–19 ("The procedures through which the pertinent portion of the order was adopted—which did not include the full measure of notice and comment

---

the Hobbs Act to provide exclusive procedures for judicial review does not raise constitutional concerns. *See generally* U.S. Br. The court addresses these arguments throughout this analysis.

The United States also claims that "[e]very court of appeals to address the scope of Hobbs Act review more generally has held that it precludes challenges to covered agency actions in suits between parties." U.S. Br. at 12 n.3 (citing cases). However, the Court's decision in *PDR Network I* undermines this contention for two reasons. First, the Court remanded the case to the Fourth Circuit without any reference to the private status of the parties. Second, the Court actually instructed the Fourth Circuit to consider the impact the 2006 FCC order had on the case without mentioning that this case is somehow an imperfect vehicle in which to do so due to the parties' status. Therefore, the court does not find that it is precluded from addressing the scope of Hobbs Act review simply because this litigation involves two private parties.

provided in connection with other parts of the order—are also consistent with the rule's characterization as interpretive rather than legislative[.]"). In 2002, the FCC sought comment on the meaning of the term "unsolicited advertisement" in the context of phone calls offering free goods and services. *Id.* at 4 (citing 17 FCC Rcd. 17,459, 17,478 ¶ 31 (2002)). In 2003, the FCC issued an order that telephonic "'[o]ffers for free goods or services that are part of an overall marketing campaign to sell property, goods, or services'" constitute "unsolicited advertisements" in violation of the TCPA. *Id.* at 5 (quoting 18 FCC Rcd. 14,014, 14,097–98 ¶ 140 (2003)).

"[T]he FCC received [55] petitions for reconsideration or clarification of its 2003 rule addressing unsolicited advertisements of free goods or services in the adjacent context of fax communications." *Id.* at 25–26. The FCC published a Federal Register notice that 55 "[p]etitions for Reconsideration and Clarification ha[d] been filed in the Commission's Rulemaking proceedings." 68 Fed. Reg. 53, 740 (Sept. 12, 2003), *available at* https://www.govinfo.gov/content/pkg/FR-2003-09-12/pdf/03-23314.pdf. The Federal Register notice "did not specify the particular subject of the petitions other than to note the underlying Commission order that they concerned[.]" U.S. Br. at 26. The underlying Commission order had the remarkably vague title "In the Matter of Implementing the Telephone Consumer Protection Act of 1991." 68 Fed. Reg. 53,740. To find out more information beyond this opaque title, an individual would have to go the FCC's physical office or contact the "Commission's copy contractor[.]" *Id.* ("The full text of this document is available for viewing and copying in Room CY–A257, 445 12th Street, SW., Washington, DC or may be purchased from the Commission's copy contractor, Qualex International (202) 863–2893.").

The FCC gave only 36 days for parties to file oppositions to the petitions. *See id.* (having published notice on September 8, 2003, FCC indicates that "[o]ppositions to these petitions must

be filed by October 14, 2003."). The FCC received seven responses, none of which addressed the offers for free goods and services. *See* FCC CG Docket No. 02-278, *available at*https://www.fcc.gov/ecfs/search/filings?authors_name=Ian%20D.%20Volner&bureaus_description=Consumer%20and%20Governmental%20Affairs%20Bureau&proceedings_name=02-278&sort=date_disseminated,DESC&submissiontype_description=COMMENT). The FCC did not address the petitions or oppositions for three years.

In 2005, the FCC issued a notice of proposed rulemaking, preceding the 2006 order at issue in this case. *See Notice of Proposed Rulemaking and Order, Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 20 FCC Rcd. 19,758 ¶¶ 1, 7 (2005). The FCC did not indicate in this notice that it would address the outstanding petitions or the issue of offers for free goods and services. *See* U.S. Br. at 26 ("[T]he Federal Register notice did not specify the particular subject of the petitions other than to note the underlying Commission order they concerned."). Therefore, affected entities had no notice that the FCC intended to render an opinion on this issue. These notice-and-comment procedures "stand[] in contrast to . . . traditional notice-and-comment procedures followed in connection with other portions of the 2006 order." *Id.* at 26.

Because of the explanatory language in the order, the FCC's decision not to publish this rule in the Code of Federal Regulations, the FCC's choice not to explicitly invoke its general legislative authority, and the aberrant notice-and-comment procedures employed in enacting the relevant portion of the 2006 FCC order, the court concludes that the relevant portion of the 2006 FCC order constitutes a non-binding interpretive rule. Interestingly, in its *PDR Network II* amicus, the United States claims that the Hobbs Act's jurisdictional command on a district court to apply FCC interpretations of the TCPA applies to "all final orders . . . made reviewable by section 402(a) of title 47, and the case law suggests that final orders may include both interpretive and legislative

orders." *Id.* at 14 (internal quotation marks and citations omitted). The United States points out that the "Supreme Court's remand order [in *PDR Network I*] did not suggest otherwise." *Id.* In *PDR Network I*, the Court indicated that "[i]f the relevant portion of the 2006 Order is the equivalent of an 'interpretive rule,' it *may* not be binding on a district court, and a district court therefore *may* not be required to adhere to it." *PDR Network I*, 139 S.Ct. at 2055 (emphasis added).

The notion that the Hobbs Act "may" apply with equal force to interpretive rules and legislative rules is incongruent with the law. The court finds that 47 U.S.C. § 402(a) applies to legislative rules, not non-binding interpretive rules.[13] Section 402(a) provides for review of "proceeding[s] to enjoin, set aside, annul or suspend any order of the [FCC] under this chapter . . . ." 47 U.S.C. § 402(a). This section applies when the FCC "exercise[s] its rule-making power" in a manner that "presently determine[s] rights" such that the "regulations have the force of law before their sanctions are invoked as well as after[.]" *Columbia Broad. Sys., Inc. v. United States*, 316 U.S. 407, 418–19, 420, 421 (1942). Section 402(a) does not apply to rules that do not "determine any right or obligation or change the plaintiff's existing or future status or condition." *Id.* at 420 (internal quotation marks omitted). Because section 402(a) does not apply to non-binding interpretive rules, the Hobbs Act does not apply in the instant case and does not mandate that the court implement the relevant portion of the 2006 FCC order. This finding comports with the Supreme Court's holding that "[i]nterpretive rules do not have the force and effect of law and are not accorded that weight in the adjudicatory process." *Perez*, 575 U.S. at 97 (citation and internal quotation marks omitted).

---

[13] In the *PDR Network II* amicus, the United States claims, without embellishment, that "courts have in appropriate cases found final FCC orders that are interpretive in character to be subject to Hobbs Act review." U.S. Br. at 14 (citing *Sorenson Commc'ns, Inc. v. FCC*, 567 F.3d 1215, 1223 (10th Cir. 2009); *Cent. Tex. Tel. Coop., Inc. v. FCC*, 402 F.3d 205, 213 (D.C. Cir. 2005)). Notably, both of the cases cited by the United States came about in a very different context than this case. The question was not whether a district court was obliged to adopt an agency interpretation, but whether the court of appeals would permit judicial review of very narrow orders.

d.   <u>Did the Defendant Have the Prior and Adequate Opportunity to Seek Judicial Review of the Relevant Portion of the 2006 Order?</u>

The court next turns to *PDR Network I*'s second question: whether the defendant had the prior and adequate opportunity to seek judicial review of the 2006 FCC order. The court concludes that it need not answer this question, and, even if it needed to answer this question, the inadequate notice-and-comment procedures demonstrate that the defendant did not have a prior and adequate opportunity to seek judicial review of the order.

The court does not need to address *PDR Network I*'s second question for two reasons. First, the two *PDR Network I* questions are not discrete. The court must only address the second *PDR Network I* question if it decides, in response to the first question, that the order is binding and legislative. *PDR Network I*, 139 S.Ct. at 2058 (Kavanaugh, J., concurring) ("[I]f the court . . . concludes that the FCC's order was an interpretive rule . . . and not subject to the Hobbs Act in the first place, then [the defendant] will be able to argue to the District Court that the FCC's interpretation of the TCPA is wrong. *Or* if the court on remand concludes that the opportunity back in 2006 for pre-enforcement review in a court of appeals was not 'adequate' for [the defendant] to obtain judicial review, then [the defendant] likewise will be able to argue to the District Court that the FCC's interpretation of the TCPA is wrong." (emphasis added)). Because the court finds that the FCC's order was an interpretive rule, there is no need to determine if the defendant had a prior and adequate opportunity to seek judicial review. Moreover, the plaintiff "decline[d] to preemptively address" the issue of whether the defendant had a prior and adequate opportunity to seek judicial review of the FCC order. The plaintiff does not "assert[] that a fact cannot be or is genuinely disputed by . . . citing to particular parts of materials in the record . . . or . . . showing that . . . [the defendant] cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c). Rather, the plaintiff refuses to engage with the second *PDR Network I* question at all. The

plaintiff indicated it would "request leave of Court to file a sur-reply" on this matter. Pl.'s Br. at 26. However, no request has come. Even if the court had an obligation to address the second *PDR Network I* question, the notice-and-comment procedures of the 2006 FCC order demonstrate that the defendant did not have a prior and adequate opportunity to seek judicial review of the order.[14]

### 4.      How to Apply the 2006 FCC Order

Having concluded that the court is not obligated to adopt the non-binding interpretive rule, the court now must now decide how to treat the relevant provision of the 2006 FCC order. "[A]gencies charged with applying a statute necessarily make all sorts of interpretive choices, and while not all of those choices bind judges to follow them, they certainly may influence courts facing questions the agencies have already answered." *United States v. Mead Corp.*, 533 U.S. 218, 227 (2001). Should the court afford deference to the FCC's 2006 order, there are two types of deference that could apply. *See Hagans v. Comm'r of Soc. Sec.*, 694 F.3d 287, 294–95 (3d Cir. 2012) (providing overview of two types of deference).

The first type of deference is *Chevron* deference, derived from *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). Under *Chevron*'s first step "[w]hen a court reviews an agency's construction of the statute which it administers,' it must ask 'whether Congress has directly spoken to the precise question at issue.'" *Hagans*, 694 F.3d at 294 (quoting

---

[14] In the *PDR Network II* amicus brief, the United States contends that the Hobbs Act provides "adequate" opportunity for review when an agency promulgates a legislative rule after notice-and-comment procedures. U.S. Br. 23–35. However, as the government acknowledges in the brief, the FCC did not employ typical notice-and-comment procedures in regard to the relevant portion of the 2006 FCC order. *Id.* at 18. In regard to interpretive rules without notice-and-comment, the government seems to contend that the Hobbs Act procedures are adequate "even in circumstances in which a particular challenge could not feasibly have been brought within the initial 60-day review period." *Id.* at 29. But, given that the defendant could not have challenged the order, this argument is unpersuasive.

Further, the Hobbs Act provides that "[a]ny party *aggrieved* by the final order [of the agency] may, within 60 days after its entry, file a petition to review the order in the court of appeals wherein venue lies. 28 U.S.C. § 2344 (emphasis added). "Any party aggrieved" means "parties to any proceedings before the agency preliminary to issuance of its order" can bring a suit. *Simmons v. ICC*, 716 F.2d 40, 42 (D.C. Cir. 1983). The record does not shed light on whether the defendant was a party aggrieved. However, if the defendant was not a party aggrieved, it did not have standing to challenge the 2006 FCC order.

*Chevron*, 467 U.S. at 842) (alteration in original). If Congress has spoken clearly and unambiguously, "the clear intent of Congress binds both the agency and the court." *Id.* (citation omitted). If Congress has not spoken clearly or the statute is silent, the court moves onto the second step. *See id.* (describing the two-step *Chevron* analysis). In the second step, "'the question for the court is whether the agency's answer is based on a permissible construction of the statute.'" *Id.* (quoting *Chevron*, 467 U.S. at 843). Alternatively, "[w]here *Chevron* deference is inappropriate, a court may instead apply a lesser degree of deference pursuant to *Skidmore v. Swift & Co.*, 323 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124 (1944)."[15] *Id.* at 294–95.

"Regardless of whether" a court ultimately applies "*Chevron* or *Skidmore* deference, [the court's] initial inquiry requires [the court] to determine whether" the portion of the statute at issue "is ambiguous." *Id.* at 295. The ambiguity inquiry comes before the "deference inquiry because [the court] need[s to] reach the deference question *only* if [it] find[s] the statutory language is ambiguous." *Id.* (citations omitted).  As the court delves into the ambiguity inquiry, the court bears in mind that the aim in "interpreting a statute is to effectuate *Congress's* intent[,]" not the intent of an agency. *Id.* (emphasis added) (citation omitted). To divine Congress's intent, the court begins the analysis with the statutory language. *See id.* ("Because we presume that Congress' intent is most clearly expressed in the text of the statute, we begin our analysis with an examination of the plain language of the relevant provision." (citation and internal quotation marks omitted)).

The court concludes that Congress spoke clearly in defining the term "unsolicited advertisement." In the section entitled "definitions", Congress blatantly defined "[t]he term 'unsolicited advertisement'" as "any material advertising the commercial availability or quality of

---

[15] *Chevron* deference is inappropriate where Congress has not "'delegated authority to the agency generally to make rules carrying the force of law, and the agency interpretation claiming deference as promulgated in the exercise of that authority.'" *Hagans*, 694 F.3d at 300 (quoting *Mead*, 533 U.S. at 226–27).

any property, goods, or services which is transmitted to any person without that person's prior express invitation or permission, in writing or otherwise." 47 U.S.C. § 227(a)(5). Congress was not silent or ambiguous in dictating that an unsolicited advertisement requires a commercial component.

Congress's definition adheres to the plain meaning of the term "advertisement." An "advertisement" is "[a] notice or announcement in a public medium promoting a product, service, or event or publicizing a job vacancy." *Advertisement*, Oxford English Dictionary, https://www.oxfordlearnersdictionaries.com/us/definition/english/advertisement. The term "promoting" entails commercial enterprise insofar as it means "to help sell a product, service, etc. or make it more popular by advertising it or offering it at a special price," *Promote*, Oxford English Dictionary, https://www.oxfordlearnersdictionaries.com/us/definition/american_english/promote, or "to present (merchandise) for buyer acceptance through advertising, publicity, or discounting." *Promote*, MERRIAM-WEBSTER     DICTIONARY,     http://www.merriam-webster.com/dictionary/promote?utm_campaign=sd&utm_medium=serp&utm_source=jsonld.[16]

Because the definition of "unsolicited advertisement" is not ambiguous, the court does not apply *Chevron* or *Skidmore* deference to the portion of the FCC's 2006 order concerning free seminars. *See United States v. Geiser*, 527 F.3d 288, 294 (3d Cir. 2008) (concluding, in part, that because statute did not define particular term in its definitions section, term was ambiguous). Instead, the court applies the term as it is explicitly defined in the statute. Given that the fax concerned a free seminar and lacked any commercial element, the court concludes that the fax does not constitute an unsolicited advertisement in violation of the TCPA.[17]

---

[16] This definition also comports with the FCC's definition of an "advertisement" as "any material advertising the *commercial availability* or quality of any property, goods, or services." 47 C.F.R. § 64.1200(f)(1) (emphasis added).
[17] The court recognizes that this decision stands inapposite of decisions on this same issue that other courts have rendered. *See Physicians Healthsource, Inc. v. Boehringer Ingelheim Pharm., Inc.*, 847 F.3d 92, 96 (2d Cir. 2017)

### 5.      Conversion Claim

Having granted the summary judgment motion on the TCPA claim, the court declines to exercise supplemental jurisdiction over the plaintiff's state law claim for conversion. Section 1367(c)(3) contemplates and permits the court to exercise its discretion when only a state law claim remains in a case. 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction[.]"). "Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law." *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966). Even the plaintiff indicates that were the court to grant summary judgment on the TCPA claim, the plaintiff would "not request that the Court retain jurisdiction over the conversion claim."[18] Pl's Br. at 26. Therefore, the court declines to exercise supplemental jurisdiction and dismisses without prejudice the remaining conversion claim. *See Robert Mauthe M.D., P.C. v. Optum, Inc.*, Civ. A. No. 17-1643, 2018 WL 3609012, at *7 (E.D. Pa. July 27, 2018) (declining to exercise supplemental jurisdiction over state law conversion claim after summary judgment entered on plaintiff's TCPA claim), *aff'd* 925 F.3d 129 (3d Cir. 2019) (holding that "the Court did not err in declining to exercise supplemental jurisdiction over Mauthe's state law claim").

---

(applying pretext analysis under 2006 FCC order and noting that "[b]usinesses are always eager to promote their wares and usually do not fund presentations for no business purpose"); *America's Health & Res. Ctr., Ltd. v. Promologics, Inc.*, Case No. 16 C 9281, 2017 WL 5001284, at *3 (N.D. Ill. Nov. 2, 2017) (finding that "[c]ourts within this District have accepted [the FCC's] construction of the [TCPA] and recognize that faxes promoting a free seminar may constitute an unsolicited advertisement since free seminars are often a pretext to market products or services." (citation and internal quotation marks omitted) (collecting cases)). However, courts entered these decisions prior to *PDR Network I*, which this court finds fundamentally alters the pertinent analysis.

[18] The plaintiff also does not argue that the court has an independent basis for jurisdiction over this claim.

## IV.    CONCLUSION

The court grants the defendant's motion for summary judgment with respect to the plaintiff's claims brought under the TCPA because the fax does not constitute an unsolicited advertisement as defined outright in the TCPA. The court also dismisses without prejudice the remaining state law claim because the court declines to exercise jurisdiction over it pursuant to section 1367(c)(3).

The court will enter a separate order.

BY THE COURT:


/s/ *Edward G. Smith*
EDWARD G. SMITH, J.